IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNSECURED CLAIM POOL SUB-TRUST OF THE LIQUIDATION TRUST OF LILIS ENERGY, INC. AND ITS DEBTOR AFFILIATES,<br><br>PLAINTIFF,<br><br>V.<br><br>RONALD ORMAND,<br>GLENN DAWSON, AND<br>JOSEPH DACHES,<br><br>DEFENDANTS. | JURY TRIAL DEMANDED<br><br>Case No. _____ |

## COMPLAINT

The Unsecured Claim Pool Sub-Trust of the Liquidation Trust of Lilis Energy, Inc. and its Debtor Affiliates (the "Sub-Trust," or "Plaintiff"), files this *Complaint* ("Complaint") for damages and in support thereof alleges as follows:

### NATURE OF THE CASE

1. Lilis Energy, Inc. and its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on June 28, 2020.[1]

2. The following individuals served various roles with the Debtors at all times pertinent to this Complaint and are referred to collectively herein as the "Directors and Officers," or "Defendants": Joseph Daches (Director and Officer); Ronald D. Ormand (Director and

---

[1] The Debtors' chapter 11 jointly administered bankruptcy cases remain pending and are captioned as *In re Lilis Energy, Inc.*, et al., Case No. 20-33274, United States Bankruptcy Court for the Southern District of Texas, Houston, Texas.

Chairman); Glenn Dawson (Director); and any director of the Debtors involved in self-dealing or the intentional manipulation of production and reserve data in the Debtors' public filings.

3. Defendants enjoyed years of regular income paid by the Debtors, but they are liable for breaches of fiduciary duty and under federal securities laws due to their actions and failures to act.

4. In particular, the Directors and Officers breached their fiduciary duties and violated securities laws by, among other things, participating in or knowingly permitting the Debtors to engage in fraudulent and illegal conduct that damaged the Debtors, including the manipulation of Debtors' production and reserve data in public filings and the unlawful firing of two whistleblower employees who brought this matter to the attention of Daches, Ormand, and Dawson, as well as Director Peter Benz (at least).

5. Notably, the causes of action asserted here are outside the scope of the releases provided in the Plan and Confirmation Order (as such terms are further described and defined below). The Plan provides an express carve-out as to "any Person from any claim or Cause of Action related to an act or omission that is determined in a Final Order by a court [of] competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence by such Person." Plan, Article VIII, Paragraph C; Confirmation Order, ¶38. Notwithstanding anything to the contrary, Plaintiff only asserts those causes of action that were not released pursuant to the Plan and Confirmation Order.

6. The Sub-Trust seeks to recover damages from the Directors and Officers for their intentional failure to detect or investigate ongoing violations of law by the Debtors. Thus, the Sub-Trust brings claims against the Directors and Officers for their violations of federal securities laws and for their breaches of fiduciary duties to the Debtors.

## JURISDICTION AND VENUE

7. Claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the S.E.C. (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1334 and Section 27 of the Exchange Act (15 U.S.C. §78aa). Additionally or alternatively, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 157(d) and (e) because (i) resolution of this proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce and (ii) Plaintiff is demanding a jury trial and does not consent to such jury trial being heard by the Bankruptcy Court.

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged here, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices were located in this district.

10. In connection with the acts, transactions, and conduct alleged here, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. The Sub-Trust is the proper party in interest authorized to pursue the causes of action set forth in this Complaint pursuant to the Debtors' Plan, the Confirmation Order, and a Liquidation Trust Agreement (further described and defined below).

12. Daches is a person of the full age of majority who, upon information and belief, is domiciled in the state of Texas and who served as both an Officer and Director of Lilis Energy, Inc.

13. Ormand is a person of the full age of majority who upon information and belief, is domiciled in the state of Texas and who served as both an Officer and Director of Lilis Energy, Inc.

14. Dawson is a person of the full age of majority who, upon information and belief, is domiciled in the state of Texas and served as a Director of Lilis Energy, Inc.

## PROCEDURAL MATTERS

15. In their chapter 11 cases, the Debtors filed *Debtors' First Amended Joint Liquidating Chapter 11 Plan* [Bankr. Docket No. 647][2] (the "Plan"). The Plan provides for the creation of a Liquidation Trust and, in turn, a Sub-Trust, in accordance with the November 24, 2020 Liquidation Trust Agreement (the "Liquidation Trust Agreement") for the prosecution of certain Causes of Action to be retained for the benefit of creditors. *See* Plan at Article IV.G.1.(f).

16. In connection with the Plan, the Debtors filed a *Notice of Filing of Plan Supplement* [Bankr. Docket No. 583] ("Supplement") that:

---

[2] Documents referred to here with the pre-fix "Bankr. Docket No." were filed in the jointly-administered bankruptcy cases captioned as *In re Lilis Energy, Inc.*, et al., Case No. 20-33274, United States Bankruptcy Court for the Southern District of Texas, Houston, Texas.

a. Reserved various Causes of Action, including those related to the Debtors' Directors/Officers Policy No. ELU160318-19 issued by XL Specialty Insurance Company (*Id.*, Supplement, Exhibit A, Schedule A(i));

b. Provided the form of a Liquidation Trust Agreement (Supplement, Exhibit B). The Liquidation Trust Agreement, in turn, reserved Causes of Action including "(a) claims under contracts or for breaches of duties imposed by law; … (d) such claims and defenses as fraud …".[3]

17. The United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") subsequently entered its Findings of Fact, Conclusions of Law, and Order Confirming *Debtors' First Amended Joint Liquidating Chapter 11 Plan* [Bankr. Docket No. 673] ("Confirmation Order"). The Confirmation Order approved the Plan and Supplement, including the Liquidation Trust Agreement, and approved certain releases set forth in the Plan.

18. As previously mentioned, the causes of action asserted here are outside the scope of the releases provided in the Plan, which contained an express carve-out as to "any Person from any claim or Cause of Action related to an act or omission that is determined in a Final Order by a court [of] competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence by such Person." Plan, Article VIII, Paragraph C; Confirmation Order, ¶38.

19. Similarly, the release given by Releasing Parties (other than the Debtors) contained an express carve-out as to "any Person from any claim or Cause of Action related to an act or omission that is determined in a Final Order by a court [of] competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence by such Person." Plan, Article

---

[3] The Supplement and Liquidation Trust Agreement also reserved causes of action against a former officer/director based on securities litigation not involving the Debtors. That former officer/director is not a party here and the reserved causes of action relating to him are not included here.

VIII, Paragraph D; Confirmation Order, ¶38. Consequently, the causes of action asserted here are not released by the Confirmation Order and Plan.

20. The Confirmation Order also approved the Plan's injunction provisions. Plan at ¶38. The injunction provisions prohibited litigation against anyone benefitting from a release "except as otherwise expressly provided in the Plan." Plan, Article VIII, Paragraph F. Because the causes of action asserted here are carved out of the releases, the Plan expressly provides that the injunction is not applicable to these causes of action.

21. Notwithstanding anything to the contrary, Plaintiff only asserts those causes of action that were not released pursuant to the Plan.

22. The Liquidation Trust Agreement was executed on or about November 24, 2020. The Sub-Trust was created on the same day.

## FACTS AND ALLEGATIONS

23. The continued retention of, and failure to investigate adequately, Ormand and Daches constituted a knowing violation of the Directors' fiduciary duties in light of Ormand and Daches's fraudulent activities on behalf of the Debtors that were reported to the Board by employees. Ormand and Daches engaged in multiple securities violations on behalf of the Debtors and violated their fiduciary duty of loyalty.

24. For example, by mid-2017 former Director and CEO Avi Mirman helped position the Debtors to sell for approximately $1 billion (Debtors' assets eventually sold for closer to $40 million).[4] Debtors assembled a data room and retained two banks to assist with the effort. During

---

[4] *See* Order (I) Approving (A) The Sale of the Debtors Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief [Bankr. Docket No. 613].

these sale efforts, however, the S.E.C. brought an enforcement action against Mr. Mirman for alleged securities violations stemming from previous employment.

25. Directors Daches and Ormand, assisted by Director Dawson and others, used the S.E.C. action as a pretense to expel Mr. Mirman and gain complete control of the company to ransack it for their personal profit—Director Ormand's own S.E.C. charges, then-pending and of which the Board was aware, demonstrate that Mr. Mirman's termination was a pretense.[5]

26. Rather than sell at a profit for the benefit of all shareholders, Ormand, Daches, and others sought to "go long" and use Debtors to enrich themselves at shareholder expense through bogus bonuses and reimbursements. They consolidated their power by ousting Mr. Mirman and retaining him as a consultant, but they soon sent letters to Debtors' Directors, Officers, and Mr. Mirman directing all of them to cease any communication with each other about the potential sale. An order of this kind not only violated their fiduciary duty of loyalty (and directed others to do the same), it also represented the type of information material to investors.

27. Defendants' violations also include the intentional manipulation of production and reserve data in public filings. Two whistleblower executives reported the manipulation fraud to the Board in February 2018, but the Board permitted the unlawful retaliatory firing of the two whistleblowers by Ormand and Daches within weeks.

28. Accounts of the two former whistleblowers confirm a pattern of securities violations at the Debtors under the direction of Daches and Ormand. These whistleblowers, then Debtors' Chief Operating Officer and an Executive Vice President of Land & Business Development, discovered that the Debtors' finance department materially inflated data related to

---

[5] Debtors' public filings show prior securities fraud allegations against Chairman Ronald D. Ormand. *See* Debtors' 2017 10-K.

production and reserve estimates in public filings submitted to the S.E.C. for the years 2017 and 2018, at the direction of Daches and Ormand.

29. Among other concerns, the whistleblowers brought to the Directors' attention the intentional inflation of barrel-of-oil-equivalent per day ("boe/d") figures in Debtors' public filings describing its Delaware Basin assets. Specifically, Directors Daches and Ormand rejected accurate boe/d data of approximately 750 boe/d for many of the wells that historical data from 2012-2017 supported, and despite the whistleblowers bringing the inaccurate figures to their attention. Instead of publishing accurate data, Daches and Ormand disregarded the truth and published their own figures of 1000 boe/d.

30. The two executives brought these matters and other potentially fraudulent public statements to the attention of the Board by, at least, (1) reporting these concerns to the Board at a December 11, 2017 meeting; (2) completing required Director and Officer Questionnaires on February 22, 2018, in which the executives disclosed their concerns in writing; and, (3) verbally communicating their concerns again on February 28, 2018, during a conference call with Directors Benz and Merrill McPeak, at least.

31. The very next day after submitting the February 22 Questionnaires where the whistleblowers identified their data-manipulation concerns, Ormand called a meeting with at least one of the whistleblower executives and threatened that executive with termination if he persisted raising his concerns. Ormand also informed the executive that the Board retroactively cancelled an already-approved bonus due to the executive under his employment agreement because of his responses in the February 22 questionnaire. Finally, Ormand threatened the executive regarding future job references and told the executive he "should not be burning bridges." On information

and belief, the whistleblower executive recorded Ormand's threats against him. Director Dawson had a similar meeting with the other whistleblower and also threatened him with termination.

32. At the same time, these whistleblowers also sought payment of incentive bonuses owed to them under the terms of their employment agreements. The Directors on the Compensation Committee had awarded similar bonuses to Daches and Ormand that were based on production that included flare-gas production figures; however, the Compensation Committee took the opposite position for the whistleblowers and excluded flare-gas production when determining overall production figures, denying them the bonuses due under their employment agreements in retaliation for reporting data manipulation. Former Director McPeak, a retired four-star Air Force general and a decorated combat veteran, resigned his directorship in response to this retaliation and intentional data manipulation.

33. Despite promising to investigate the matter and respect the law's whistleblower protections, Defendants disregarded the executives' reports and conspired with Ormand to fire both executives within weeks of their reports, in violation of their duties to shareholders, the executives' employment contracts, and whistleblower protection laws. Defendants likewise conspired to publish the materially false production and reserve data in public filings even though they knew the data to be false.

## COUNT I
## Violations of Sections 10(b) and 20(a) of The Exchange Act

34. The Sub-Trust reasserts and realleges the allegations contained in the foregoing paragraphs as though fully restated here.

35. Defendants carried out a plan, scheme, and course of conduct intended to: (i) deceive the investing public and injure the Debtors, as alleged here; and (ii) cause members of the public and the Debtors' shareholders to purchase or retain Debtors' securities at artificially inflated

prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth here.

36. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Debtors' securities in an effort to maintain artificially high market prices for the securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged here or as controlling persons as alleged below.

37. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Debtors' true financial well-being and prospects, as specified here.

38. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct to assure investors of the Debtors' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary to make the statements made about the Debtors and their business operations and future prospects not misleading in light of the circumstances under which they were made, as set forth more particularly here, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon then-current shareholders and new purchasers of the Debtors' securities.

39. Each of the Defendants' primary liability and controlling-person liability arises from the following facts: (i) the Defendants were high-level executives and/or directors at the Debtors and members of the Debtors' management team or exercised control over the same; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Debtors, was privy to and participated in the creation, development, and reporting of the Debtors' internal budgets, plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Debtors' management team, internal reports, and other data and information about the Debtors' finances, operations, and sales at all relevant times; and (iv) each of these Defendants were aware of the Debtors' dissemination of information to the investing public which they knew was materially false and misleading.

40. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with intentional disregard for the truth in that they consciously failed to ascertain and to disclose these facts, even though the facts were available to them. The Defendants' material misrepresentations and/or omissions were done knowingly and for the purpose and effect of concealing Debtors' financial well-being and prospects from the investing public, thereby supporting the artificially inflated price of its securities. As demonstrated by Defendants excluding flare gas production data to deny the whistleblowers' their bonuses, while including flare gas to award bonuses to Ormand and Daches, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, intentionally failed to obtain that knowledge by deliberately refraining from taking steps necessary to discover whether those statements were false or misleading.

41.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Debtors' securities was artificially inflated. In ignorance of the fact that market prices of the Debtor's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or intentionally disregarded by Defendants, but not disclosed in public statements by Defendants, the holders and acquirers of Debtors' securities held or purchased shares at artificially high prices and were damaged, thereby creating further liabilities for the Debtors.

42.     At the time of these misrepresentations and/or omissions, the holders and acquirers of Debtors' securities were ignorant of their falsity and believed them to be true. Had the holders and acquirers of Debtors' securities and the marketplace known the truth regarding the artificially inflated production and reserve estimates and director self-dealing, which were not disclosed by Defendants, the holders and acquirers of Debtors' securities would not have held, purchased, or otherwise acquired their Debtors' securities, or, if they had acquired them, they would not have done so at the artificially inflated prices which they paid.

43.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

44.     Regarding Defendants' violations of Section 20(a), Defendants acted as controlling persons of the Debtors within the meaning of Section 20(a) of the Exchange Act as alleged here. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Debtors' operations and intimate knowledge of the false financial statements filed by the Debtors with the S.E.C. and disseminated to the investing public, the

Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Debtors, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Defendants were provided with or had unlimited access to copies of the Debtors' reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

45.     In particular, the Defendants had direct and supervisory involvement in the day-to-day operations of the Debtors and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged here, and exercised the same.

46.     As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages believed to be in excess of $900 million in connection with holdings or purchases of the Debtors' securities after August 1, 2017.

47.     As a direct and proximate result of Defendants' wrongful conduct, the Debtors and the holders and acquirers of Debtors' securities suffered damages in connection with their respective purchases and sales of the Debtors' securities.

48.     These actions constituted actual fraud and willful misconduct under the Plan.

## COUNT II
## Breach of Fiduciary Duty

49.     The Sub-Trust reasserts and realleges the allegations contained in the foregoing paragraphs as though fully restated here.

50. Ormand and the other Defendants owed the Debtors a fiduciary duty of loyalty to, among other things, act in furtherance of the best interests of the Debtors and the stakeholders.

51. As alleged here, Ormand and the other Defendants breached their fiduciary duties of loyalty to the Debtors, causing harm to the Debtors.

52. In particular, the Directors and Officers, in knowing violation of their fiduciary duties, consciously failed to detect, or in the event of detection, failed to publish the executive-whistleblowers' reports described here, and permitted the unlawful retaliatory firing of both executives within weeks of their reports to the Board.

53. Defendants likewise permitted the continued publication of materially manipulated production and reserve data in Debtors' public filings.

54. Defendants routinely submitted fraudulent reimbursement requests knowing them to be fraudulent.

55. The Directors and Officers made misrepresentations or omissions of material information in filings required by United States securities laws, including but not limited to 17 C.F.R. 240.10b-5, whether in knowledge of the data manipulation and the Debtors' fraudulent public statements, or intentionally ignorant of their substantial likelihood.

56. Thus, in violation of Nevada Revised Statute 78.138, Ormand and the other Defendants engaged in self-dealing by putting their own interests above the interests of the Debtors and the Debtors' relevant stakeholders via intentional misconduct, fraud, or a knowing violation of law.

57. As a direct and proximate result of these breaches of fiduciary duties and securities violations, Plaintiff sustained damages, as alleged here, believed to be in excess of $900 million.

58. These actions constituted actual fraud and willful misconduct under the Plan.

WHEREFORE, for the foregoing reasons, the Sub-Trust requests that the Court:

A.  Enter judgment in favor of the Sub-Trust and against the Defendants on the Sub-Trust's claims of breach of fiduciary duty;

B.  Enter judgment in favor of the Sub-Trust and against the Defendants on the Sub-Trust's claims of federal securities violations;

C.  Enter judgment in favor of the Sub-Trust and against the Defendants awarding (i) both actual and consequential damages; (ii) costs of court; (iii) pre-judgment and post-judgment interest; (iv) any attorneys' fees recoverable under any applicable law; and (v) other further relief to which the Sub-Trust may be justly entitled, with all the foregoing on the basis of joint and several liability.

[*Remainder of Page Intentionally Left Blank*.]

DATED: June 27, 2022  *Respectfully submitted,*

JONES WALKER LLP

*/s/ Joseph E. Bain*

Dan L. Cogdell
Texas Bar No. 04501500
Joseph E. Bain
Texas Bar No. 24085187
Amy K. Anderson
Texas Bar No. 24077064
811 Main Street, Suite 2900
Houston, Texas 77002
Tel: (713) 437-1800
Fax: (713) 437-1810
Email: dcogdell@joneswalker.com;
jbain@joneswalker.com; and
aanderson@joneswalker.com

-and-

Alexander B. Breckinridge, V
S.D. Tex. Bar No. 3408032
Mark A. Mintz
S.D. Tex. Bar No. 1140193
Thomas E. Slattery
*(Pro Hac Vice Application Forthcoming)*
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Tel: (504) 582-8000
Fax: (504) 582-8583
Email: abreckinridge@joneswalker.com;
mmintz@joneswalker.com; and
tslattery@joneswalker.com

***Attorneys for the Unsecured Claim Pool Sub-Trust of the Liquidation Trust of Lilis Energy, Inc. and its Debtor Affiliates***